UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| BURAY ENERGY INTERNATIONAL LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| PRISM CORPORATION Default entered | ) | No. 3:11-cv-00101-RLY-WGH |
| 3/22/2012, set aside 7/25/12 and default | ) | |
| entered 9/10/2012, | ) | |
| JOSEPH  LOFTIS Default entered 4/19/2012, | ) | |
| set aside 7/25/12 and default entered | ) | |
| 9/10/2012, | ) | |
| | ) | |
| Defendants. | ) | |

**COURT'S ENTRY ON DEFAULT JUDGMENT AND AWARD OF REMEDIES**

Plaintiff, BuRay Energy International LLC ("BuRay"), moves for an entry of

default judgment under Federal Rule of Civil Procedure 55(b) and for several equitable

and legal remedies.  Defendants, Prism Corporation ("Prism") and Joseph Loftis

("Loftis") ("collectively "Defendants"), moved for a hearing on the damages requested.

The court granted this request and heard evidence on September 10, 2013.  Having

reviewed the evidence and filings, the court **GRANTS default judgment in part** and

**DENIES it in part**.

I.      **Background**

In July of 2010, BuRay entered into an agreement with Burks Oil & Gas Properties,

Inc. ("Burks"), in which Burks agreed to evaluate and market BuRay's oil and gas

properties in Oklahoma.  (Sec. Am. Comp. ¶ 6).  Burks acted as a broker for BuRay.

(Damages Hearing Transcript ("Transcript") 13:14-23).  On December 3, 2010, Burks

entered into a Confidentiality Letter Agreement (the "Confidentiality Agreement") with

Prism, a corporation owned by Loftis. As part of this agreement, Burks provided

confidential information regarding BuRay's properties to Prism in order for Prism to

evaluate the acquisition of the properties. (Confidentiality Agreement ¶ 2). Among other

things, Prism agreed in the Confidentiality Agreement to not compete with BuRay,

including through the acquisition of other leases and interests in the Area of Mutual

Interest ("AMI").[1] (*Id.* at ¶ 7).

On January 21, 2011, Prism and BuRay executed the Term Sheet – Talihina Field

Area setting forth a sale by BuRay to Prism of the oil and gas leases and operations, gas

wells, and a gas gathering and pipeline system (collectively known as the "Talihina

Prospect"). The parties then entered into several other agreements:

- On February 11, 2011, BuRay and Prism entered into the Purchase and Sale

  Agreement (the "Wells and Leases PSA"), whereby BuRay agreed to sell oil

  and gas leaseholds located in LeFlore County, Oklahoma and other assets to

  Prism;

- On March 22, 2011, BuRay and Prism entered into another Purchase and Sale

  Agreement, whereby Prism agreed to purchase from BuRay the operating

---

[1] The Area of Mutual Interest includes sections 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 20, 21, 22, 23, and 24 in Township 3 North, Range 22 East of LeFlore County, Oklahoma and the entirety of sections 4, 5, 6, 7, 8, 9, 16, 17, 18, 19, 20, and 21 in Township 3 North, Range 23 East of LeFlore County, Oklahoma. The AMI was decreased in Amendments I and II due to representations made by Prism and Loftis that they had investigated the above sections in Range 23 East (the "Upland Leases") and that real estate was not available for leasing. BuRay alleges in Count VI that this was a fraudulent misrepresentation. Because default judgment has been entered, this allegation is true. The court will, therefore, construe the AMI to include the Range 23 East sections.

rights and other contractual rights and interests relating to the wells and leases (the "Operating PSA");

- On March 22, 2011, Prism and 4 Square Gas, LLC ("4 Square") entered into another Purchase and Sale Agreement, whereby Prism agreed to purchase 4 Square's fractional interest in the Talihina Gas System ("Pipeline Agreement I");

- On March 22, 2011, Prism and TAG Petroleum, Inc. ("TAG") entered into another Purchase and Sale Agreement, whereby Prism agreed to purchase TAG's interest in the Talihina Gas System ("Pipeline Agreement II"); and

- On May 20, 2011, BuRay, Prism, 4 Square, and TAG entered into an Amendment to Purchase and Sale Agreements – Talihina SE, which amended the Wells and Leases PSA, the Operating PSA, and Pipeline Agreement I. It rescinded Pipeline Agreement II, and amended the closing dates for the prior agreements.

Prism and BuRay closed the Wells and Leases PSA on May 20, 2011. As a result, BuRay delivered to Prism an Assignment of Oil and Gas Leases and Bill of Sale, which conveyed the properties and related assets to Prism ("Wells and Leases Assignment"). The Operating PSA was scheduled to close on June 6, 2011, however this did not occur. As a result, Prism, BuRay, 4 Square and John J. Buthod, Esq., entered into the Escrow Agreement. The Escrow Agreement incorporated all the prior agreements with the exception of the Confidentiality Agreement. Prism failed to make cash payments

pursuant to the Escrow Agreement. In fact, BuRay asserts that it has not received anything of value from Prism. (Transcript 81:11-13).

After this failure, BuRay brought suit against Prism and Loftis for breaching the Escrow Agreement, the Wells and Leases PSA, the Operating PSA, and the Confidentiality Agreement. In addition, BuRay alleges fraud and offenses against its property (the proprietary information). BuRay filed its original Complaint in August 2011, its First Amended Complaint in January 2012, and then its Second Amended Complaint in February of 2012. Defendants' counsel then withdrew. (Docket # 50).

The Defendants failed to answer the Second Amended Complaint despite being granted two extensions of time. The clerk entered default against Defendants on March 22, 2012. (Docket # 58). Defendants obtained new counsel and moved to set aside that entry. The court set the entry aside on July 25, 2012. (Docket # 76). Defendants' counsel withdrew after this, and once again, Defendants failed to answer the Second Amended Complaint. The Clerk entered default on September 10, 2012 (Docket # 89). BuRay filed the present Motion for Default Judgment (Docket # 93) on March 8, 2013. Defendants then obtained a third attorney and moved for a hearing on the issue of damages pursuant to Rule 55(b)(2). The court granted the hearing. Evidence was presented to the court by both sides on September 10, 2013. Both parties were given an opportunity to submit their proposed findings of fact and conclusions of law; only BuRay took advantage of this opportunity in a timely manner. (Docket # 121). Defendant submitted their proposed findings over a month late. (Docket # 122).

## II.     Standard

Once the Clerk enters default under Rule 55(a), the court has the power and discretion to enter a default judgment under Rule 55(b).  *Stillwater of Crown Point Homeowner's Ass'n, Inc. v. Kovich*, No. 2:09-cv-147-PPS-PRC, 2010 WL 1541188, * 1 (N.D. Ind. Apr. 15, 2010) (citing *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 988 F.2d 1394, 1398 (7th Cir. 1993)).  Default judgment is not entered as a matter of right.  *See Witzlib v. Cohen*, No. 08c0342, 2009 WL 4030485, *1 (E.D. Wis. Nov. 20, 2009).

In determining if default judgment is appropriate, the court should consider such factors as "the amount of money potentially involved, whether material issues of fact or issues of substantial public importance are at issue, whether the default is largely technical, whether plaintiff has been substantially prejudiced by the delay involved and whether the grounds for default are clearly established or are in doubt."  *Id.* (citing *Federal Practice and Procedure* § 2685 (3d ed. 1998).

## III.     Discussion

### A. Default Judgment

The court finds that default judgment is appropriate here for Counts I – III and V - VIII.  The court finds that these breaches were clearly established by the record.  For example, Prism breached the escrow agreement by failing to submit the cash payment as it required.  Prism breached the Wells and Leases PSA by failing to improve the BuRay leases as it required.  Prism breached the Operating PSA by failing to make the payments and damaging one of the wells located on the leased property.

The court will not grant default judgment for Count IV – Breach of the Confidentiality Agreement. According to BuRay, Prism and Loftis breached the Confidentiality Agreement by acquiring interests in the AMI. (Transcript 49:15-17). However, as Prism and Loftis argue, they were expected and contractually required to obtain new leases in the AMI. For example, Wells and Leases PSA states under the heading "Obligations of [Prism]" that:

> Prism agrees to undertake the actions described in Exhibit 'I' [acquisition of new leases in the AMI covering up to 7000 gross acres] . . . and the acquisition of additional leases and acreage in the AMI, subject to [Prism's] sole discretion as to the number of acres or ultimate final gross acreage acquired.

(Wells and Leases PSA ¶1.7) In addition, under the Operating PSA,

> [BuRay agrees to continue to assist [Prism] in its efforts to acquire new leasehold acreage in the AMI up to the Closing Date and agrees not to impede or interfere with [Prism's] efforts to acquire such additional leasehold acreage.

(Operating PSA ¶ 1.4). The evidence further suggests that BuRay was complying with its obligation under the Operating PSA. Mr. Schofield, the part-owner of BuRay, testified that he introduced Loftis to landowners in order to assist Loftis in acquiring those leases. (Transcript 84:2-15). He stated that this was done in order for Mr. Loftis to "buy our deal and perform." (*Id.* 84:12-15).

Because Prism was obligated to acquire these leases, the court finds that the grounds for default on Count IV are in doubt. The court therefore, **DENIES** default judgment for Count IV of the Second Amended Complaint.

## B. Remedies Sought

An entry of default judgment "establishes, as a matter of law, that defendants are liable to plaintiff on each cause of action alleged in the complaint." *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012) (citing *United Sates v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989). "Upon default, the well-pled allegations of the complaint relating to liability are taken as true, but those relating to the amount of damages suffered ordinarily are not." *Wehrs*, 688 F.3d at 892. The plaintiff must prove damages. *Id.* As such, the defaulting party "may raise the issue of causation as it relates to the calculation of damages." *Id.*

BuRay asserts that pure monetary damages are not enough, and therefore seeks the following to make it whole: (1) termination of all agreements between the parties, except the Confidentiality Agreement, (2) the return of all materials and documentation relating to the Information, (3) the transfer back of the BuRay Leases, (4) the cost to drill a well comparable to the Curtis McCoy Well ("McCoy Well"), (5) the transfer of the Prism Leases, (6) a permanent injunction, (7) liquidated damages, and (8) attorneys' fees. The court will deal with each requested form of relief in turn.

Before determining which remedies BuRay is entitled to, the court must determine which state law to apply. The Escrow Agreement states that it "shall be construed, enforced, and administered in accordance with the laws of the State of Indiana." (Escrow Agreement ¶ 9). In addition, it amends all of the Purchase and Sale Agreements to the extent that they are inconsistent with it. (*Id.* at ¶ 12). Therefore, the Wells and Leases PSA, the Operating PSA, the Pipeline Agreement I, the Pipeline Agreement II, Amendment I, Amendment II, and the Escrow Agreement are all governed by Indiana

law.  On the other hand, the Confidentiality Agreement was not amended by the Escrow

Agreement, nor could it have been.  The court has been presented with no evidence that

this agreement had been amended by Burks and Prism.  Therefore, the forum selection

clause in the Confidentiality Agreement which selected Texas law must govern it.

(Confidentiality Agreement ¶ 15).

### i.  Termination of the Agreements

BuRay requests that the court terminate all agreements between BuRay and Prism,

except for the Confidentiality Agreement.  As support for this remedy, BuRay cites to the

Wells and Leases PSA and the Operating PSA, which both state, in nearly identical

terms, that if "[Prism] default[s] under this Agreement in any material way . . . [BuRay]

may terminate this Agreement . . . ."  (Wells and Leases PSA ¶ 11.1; Operating PSA ¶

10.1).  Defendants do not provide any evidence or argument as to why the agreements,

with the exception of the Confidentiality Agreement, should not be terminated.

Therefore, the court hereby terminates all agreements, except for the Confidentiality

Agreement between BuRay and Prism.

### ii.  Return of any and all Documentation

Throughout the course of the dealings between the parties, several types of

information were exchanged.  BuRay demands the return of all the Information at Prism's

and Loftis' sole cost.  As support for this form of relief, BuRay cites to Paragraph 8 of the

Confidentiality Agreement, which states:

> in the event that the transaction contemplated by this Agreement is not
> consummated . . . all Information (and all copies, summaries and notes of
> the content or parts thereof) shall be returned in its entirety . . . and not

retained by [Prism] . . . in any form or for any reason, except that [Prism] may retain a summary to document the management decision making process relative to this potential acquisition.

Prism and Loftis do not contest this form of relief. Therefore, the court orders the Information returned to BuRay.

### iii. Transfer of the BuRay Leases

In order to be made whole, BuRay seeks the return of the BuRay Leases and related assets that it transferred to Prism. BuRay asserts that it is entitled to the transfer back of these leases and assets due to Prism's material default and pursuant to Paragraph 1.7 of the Wells and Leases PSA, which states in pertinent part:

If, in [Prism's] sole judgment, the production or reserve base does not indicate a commercial or viable project and [Prism], for any reason, determines not to proceed with further exploration or development of the Assets and/or the AMI, then [Prism] agrees to thereupon assign the original project back to BuRay . . . including the original wells and associated equipment, access to the gas gathering system, and any leases and acreage [Prism] has acquired in the AMI . . . .

The court finds that this paragraph does not lend support to the requested relief because it requires Prism to determine that it is not a commercial or viable project. There is no evidence in the record that Prism made that determination.

BuRay also relies on Paragraph 11.1 of the Wells and Leases PSA, which states that upon Prism's default "[BuRay] shall be free immediately to enjoy all rights of ownership of the Assets and to sell, transfer, encumber or otherwise dispose of the Assets to any party . . . ." Although this language does not specifically instruct Prism to assign the rights back to BuRay, the court can find no other action that could bring effect to such language. As such, the court agrees that due to the material breach of the contracts and

Paragraph 11.1 of the Wells and Leases PSA, Prism must transfer back to BuRay all the interests in the BuRay Leases and assets that it currently possesses. This shall be done **within 30 days**.

### iv. Cost of a New Well

BuRay also asserts that it is entitled to the reasonable cost of drilling a new well comparable to the McCoy Well,[2] which Prism and Loftis allegedly damaged. The Second Amended Complaint contains no direct allegations that Prism and Loftis damaged this well; but merely that Prism breached the Operating PSA by setting a plug in the McCoy Well. (Second Amended Complaint ¶ 48b). As such, Prism challenged that its conduct was the cause of the damage; BuRay bears the burden of establishing its damages. *See Wehrs*, 688 F.3d at 892. At the hearing, BuRay more specifically alleged that Prism damaged the well by (1) placing a plug at 9128 feet, (2) pouring sand on top of the plug, and (3) using an insufficient percentage of Potassium Chloride ("KCl") water in the well.

First, BuRay alleges that the placement of a plug in the well has damaged the well. BuRay presented expert testimony on this matter from Mr. Scott Byrnes, a registered petroleum engineer and the president of Burks. According to Mr. Byrnes, this placement is approximately 90 feet above the perforations[3] in the well.[4] (Transcript 39:7-12).

---

[2] The McCoy Well is one of the wells located on the land in LeFlore County, Oklahoma leased to Prism by BuRay under the Wells and Leases PSA and Operating PSA.

[3] Perforations are holes in the casing of a well through which the natural gas flows into the wellbore. *See* perforation, https://www.osha.gov/SLTC/etools/oilandgas/glossary_of_terms/glossary_of_terms_p.html

Because the plug may not be drillable, it would interfere with reaching the lower Jack Fork formations. The cost from losing approximately 90 feet in the lower Jack Fork formations is unknown and undeterminable. (Transcript 23:25, 24:1-9). Nevertheless, Mr. Byrnes compared this well to one in a similar formation and concluded that the feet lost would have produced nearly $4 million dollars worth of gas before royalties when compared to similar formations. (Transcript 24:23-25, 25:1-24).

Second, according to BuRay, Prism's use of sand damaged the McCoy Well. BuRay's witness, Raymond J. Smith, a directional driller, testified that one should not "pour" sand on top of a plug, but rather should "spot it." (Transcript 62:17). Spotting it involves using a tool or tubing to spot the sand directly on top of the well. (*Id.* at 62:17-19). According to Mr. Smith, if something were to happen to the plug that the sand was poured on top of, it could damage the well. (*Id.* at 62:13-17). On the other hand, BuRay's expert, Mr. Byrnes, testified that "you would typically pour sand on top of the plug to protect it." (*Id.* at 39:21-22). Furthermore, Prism's expert, Mr. Stone, testified that he has previously poured sand on top of a bridge plug, which would not ruin a well unless it covered up the perforations. (*Id.* at 130:5-12). Additionally, he testified that the sand can be removed by "circulating or bailing." (*Id.* at 130:22-25). In his opinion, sand would not generally harm a well. (*Id.* at 131:1-7). The court finds that BuRay did not meet its burden to show that the well was damaged by the sand poured on top of the plug.

---

[4] The exact depth of the plug remains unknown. A letter from Loftis indicated it was set at 9248 feet; however, a Baker Hughes Invoice indicates it was set at 9128 feet. Because the fish, a piece of tool left in the well, is located at 9245 feet, the court finds that the plug is more likely set at 9128 feet.

Third, BuRay presented testimony regarding the KCl water by its expert witness John Schofield, a part owner of BuRay and registered petroleum engineer. KCl water is used to prevent the clay in a formation from swelling. (*Id.* at 127:14-16). Mr. Schofield testified that from the literature he reviewed, specifically a Halliburton article, 2% KCl is insufficient to protect the formation and 7% should be used. (*Id.* at 27:9-15). Therefore, he concluded that Prism's use of 2% KCl water would have damaged the formation. (*Id.* at 27:19-22). During cross examination, Mr. Schofield admitted he does know how much clay was in the formation or if that clay had in fact swollen as a result of the 2% KCl water. (*Id.* at 27:19-25). Prism's expert, Mr. Stone, a petroleum engineer, testified that he was not experienced enough with Oklahoma to know whether 2% KCl is a common blend to use there; however, he had used it before elsewhere. (*Id.* at 127:14-17).

The court finds that Prism damaged the McCoy Well by using 2% KCl water and placing the plug in the well, thereby closing off 90 feet of production from the lower Jack Fork sands. Finding that BuRay has met its burden, the court turns to the appropriate remedy. BuRay contends that it should be awarded the costs to build a new well comparable to the McCoy Well in order to be made whole. BuRay indicates that the cost to drill a new comparable well would be $3,797,712 (Exhibit 4); Prism presents the court with a much lower figure of $1,698,250 (Exhibit C). To determine the appropriate amount, the court must compare the McCoy Well at the time Prism acquired it to the new well estimates.

BuRay dug the McCoy Well to a level of approximately 9,410 feet; however, a fish[5] was left in the well by BuRay at a level of 9,245 feet. (Transcript 29:17-21). Because of the fish, the well could not produce natural gas from the area below 9,245 feet. (*Id.* at 29:22-25, 30:1-2). The McCoy Well was not fracked,[6] which would have to be completed before it was a commercially productive well. (*Id.* at 37:16). Thus, although the McCoy Well produced natural gas, it was not a commercially productive well when BuRay transferred it to Prism. When BuRay marketed this well, they indicated that an investment of an additional $1.2 million would be needed to make it commercially productive. (Transcript 44:2-5).

BuRay's estimate of $3.797 million is for the construction of a well to 10,000 feet that has been fracked and would be a commercially productive well. (Exhibit 4). This estimate, therefore, is not for a comparable well, but for an improved well. Because a "non-breaching party is not entitled to be placed in a better position than [it] would have been in if the contract had not been broken," the court declines to adopt BuRay's estimate. *Sheppard v. Stanich*, 749 N.E.2d 609, 611 (Ind. Ct. App. 2001). Prism's estimated cost is from BuRay's Talihina Field Divestment Data Package Fall 2010. (Exhibit C). That estimate does not include fracking. (*Id.*). The court will therefore

---

[5] According to Mr. Byrnes, "a fish is a piece of equipment – in this case it was drill pipe and a drill bit – that was left in the hole during the initial completion process of the well." (Transcript 29:18-21). In order to produce gas from below the fish "you would have to attempt to remove the fish or the piece of pipe out of the hole." (*Id.* at 30:1-2).

[6] Fracking is also known as hydraulic fracturing. It is an operation in which a specially blended liquid is pumped down into a well and into a formation under pressure high enough to cause the formation to crack open, forming passages through which natural gas can flow into the wellbore. *See* hydraulic fracturing, https://www.osha.gov/SLTC/etools/oilandgas/glossary_of_terms/glossary_of_terms_h.html.

adopt that estimate.  Prism is required to pay BuRay the amount of $1,698,250 for the cost of a new well comparable to the McCoy Well.

### v.  Transfer of the Prism Leases

BuRay seeks the transfer of the Prism Leases as a remedy for breach of the Confidentiality Agreement.  Because the court denied default judgment for breach of the Confidentiality Agreement, the court will not grant such relief.

The court notes, however, that Prism had agreed to pay for the Assignment of the Oil and Gas Leases out of 40% of the gross revenue received from the BuRay and Prism leases.  (Memorandum of Understanding ¶ 2).  Therefore, a benefit was due to BuRay for the use of its confidential information and help in obtaining the Prism Leases.  The court therefore **ORDERS** Prism to pay 40% of its gross revenues from the Prism Leases located in the AMI to BuRay.

Should Prism choose not to develop these leases, then the court will deem it as an admission, for purposes of Paragraph 1.7, that Prism believes the project is not viable.  If that is the case, then Prism must assign any leases and acreage in the AMI to BuRay. (Wells and Leases PSA ¶ 1.7) (stating "If, in [Prism's] sole judgment, the production or reserve base does not indicate a commercial or viable project and [Prism], for any reason, determines not to proceed with further exploration or development of the Assets and/or the AMI, then [Prism] agrees to thereupon assign . . . to BuRay . . . any leases and acreage [Prism] has acquired in the AMI . . .").

### vi.  Injunction

BuRay seeks a permanent injunction against Prism and Loftis. A permanent injunction may be granted when the moving party satisfies four factors:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that, considering the balance of harms between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.

*Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2747-48 (2010). BuRay argues that damages alone are insufficient to protect its interests, and thus an injunction is needed to protect the Information, which Prism and Loftis used to their advantage and BuRay's detriment. In addition, BuRay contends that Prism and Loftis have no right to the property interests or Information and as such will not be harmed by a permanent injunction being issued against them. Finally, according to BuRay, the public interest would be served by protecting property rights.

The court agrees that BuRay has suffered an irreparable injury by Prism's and Loftis' use of BuRay's confidential information. Damages are not sufficient to protect the properties and BuRay from further action by Prism and Loftis. In addition, the court finds that the balance of harm favors an injunction. The court therefore **GRANTS** the permanent injunction.

### vii.  Liquidated Damages

BuRay contends that it is entitled to $200,000 in liquidated damages. As support, BuRay cites to the Wells and Leases PSA and the Operating PSA, which both state, in nearly identical provisions, that if Prism defaults and BuRay terminates the agreement, "[Prism] shall immediately pay [BuRay] the cash sum of Two Hundred Thousand Dollars

15

($200,000) as liquidated damages for [Prism]'s default." (Wells and Leases PSA ¶ 11.1; Operating PSA ¶ 10.1). Defendants did not argue that the liquidated damages provision does not apply. The court finds the liquidated damages provisions are enforceable, and thus, the Defendants are liable to BuRay for the amount of $200,000.

### viii. Attorneys' Fees

BuRay contends that it is entitled to its reasonable attorneys' fees and legal expenses pursuant to the Operating PSA, the Wells and Leases PSA, and the Confidentiality Agreement. (¶¶ 59, 60, 63). In addition, BuRay argues that it is entitled to reasonable attorney's fees under the Indiana Crime Victims Relief Act, Ind. Code 34-24-3-1.[7] (¶ 67). Exhibits 12 – 15 from the damages hearing detail the requested attorneys' fees. The court finds that attorneys' fees should be awarded in this case; nevertheless it must first determine if the proposed fees are reasonable. Prism and Loftis failed to object to the reasonableness of the attorneys' fees.

Mr. Buthod's Fees

The court finds that Mr. Buthod's affidavit and attachment are insufficient for the court to make a determination as to reasonableness because the documents lack any description for the time spent. Mr. Buthod is hereby **ordered** to submit to the court a

---

[7] The Indiana Crime Victims Relief Act (Ind. Code 34-24-3-1) is a statutory exception to the general rule in Indiana that each party pays his or her attorneys' fees. Under this statute, a victim is entitled to his attorneys' fees for certain claims. Courts have limited attorneys' fee awards just to the prosecution and defense of those specific claims and not to the fees arising out of additional counts not covered under the Indiana Crime Victims Act. *See Rehman v. Anjum*, No. 3:10-cv-220, 2013 WL 3322013, * 5 (N.D. Ind. Jul. 1, 2013)(slip copy). Although this would usually require a more detailed break down of the attorneys' fees than submitted, the court finds that such a breakdown is not necessary because attorneys' fees are to be awarded for the other counts under the contract provisions.

supplemental filing with a detailed description of his work on this lawsuit and corresponding time spent within thirty (30) days from this order.

Bowers Harrison Attorneys' Fees

Three attorneys from Bowers Harrison LLP submitted affidavits for the award of attorneys' fees. Greg Granger charges at an hourly rate of $270 and seeks $11,961 in fees. Mark Miller also charges at an hourly rate of $270 and seeks $96,550 in fees. Clifford Whitehead charges at an hourly rate of $175 and seeks $39,758 in fees. The court finds that the hourly rates charged by each attorney are reasonable in light of the experience each attorney possesses and for the Evansville, Indiana area. Each attorney submitted a detailed print out explaining the time charged. In addition, the court notes that Mr. Miller has been working on this case since December 2010. Prism and Loftis did not object to the amount of attorneys' fees requested. The court, therefore, finds that they are reasonable and awards the requested amounts.

Counsel has thirty (30) days to file an update to the calculations.

**IV.    Conclusion**

For the reasons stated above, the court **GRANTS in part and DENIES in part** BuRay's Motion for Default Judgment (Docket # 93). The court grants default judgment for Counts I-III and V-VIII. Therefore, the court hereby **ORDERS and ADJUDGES** the following relief:

1.  The following agreements between BuRay and Prism are hereby terminated:

    a.  The Wells and Leases PSA,
    b.  The Wells and Leases Assignment,
    c.  The Operating PSA,

d. The Pipeline Agreement I,
e. The Pipeline Agreement II,
f. The Amendment I,
g. The Amendment II, and
h. The Escrow Agreement.

2. Prism and Loftis, at their sole cost and expense, shall return to BuRay within **thirty (30) days** from the date of this Entry any and all documentation or materials relating to the Information. The Information includes, but is not limited to:

a. Any and all documentation provided to or obtained by Prism and/or Loftis pursuant to the terms of the Confidentiality Agreement, including but not limited to documentation relating to the following:

i. The wells used in connection with the oil and gas leases within the AMI located in LeFlore County, Oklahoma (the "BuRay Leases," more particularly described in Docket No. 45-1, and attached to this Entry as Exhibit 1). Those wells located on and used exclusively in connection with the BuRay Leases (all collectively referred to as the "Wells") are more particularly described in Section 1.1(b) of the Wells and Leases PSA as:

1. Perkins Well #1-16, American Petroleum Institute Number (the "API Number") 35-079-21704 located in LeFlore County, Oklahoma;

2. Perkins Well #2-16, API Number 35-079-21842 located in LeFlore County, Oklahoma;

3. Griffith Well #1-15, API Number 35-079-21765 located in LeFlore County, Oklahoma;

4. Paul Hale Well #1-14, API Number 35-079-21885 located in LeFlore County, Oklahoma;

5. Curtis McCoy Well #1-13, API Number 35-079-21914 located in LeFlore County, Oklahoma;

6. Fry Well #1-17A, API Number 35-079-21798A located in LeFlore County, Oklahoma;

ii. The BuRay Leases;

iii. The entirety of Sections 1 through 5, 8 through 17, and 20 through 24 in Township 3 North, Range 22 East of LeFlore County, Oklahoma and the entirety of Sections 4 through 9 and 16 through 21 in Township 3 North, Range 23 East of LeFlore County, Oklahoma (the "Area of Mutual Interest" or "AMI").

b. Any and all documentation relating to the BuRay Leases, AMI, Wells, or related assets given to Prism or Loftis by BuRay's accountants, Brown Smith and Settle, including:

i. Operating agreements with working interest owners;

ii. List of royalty owners;

iii. List of payments to royalty owners for shut in payments;

c. Field Logs, Barry Mercer Geological cross sections, electric logs, engineering well completion reports, drilling reports, reservoir engineering

reports, geological reports, accounting records, lessor information, production and sales information, marketing materials, division orders, any letters for approval of division orders, investor contracts, correspondence with investors, title opinions, list of royalty owners, and list of payments to royalty owners for shut in payments as they are related to the Wells, AMI, BuRay Leases, or related assets.

3. Prism is ordered to assign back to BuRay all the BuRay Leases within **thirty (30) days** of the date of this Entry. BuRay shall then be free to immediately enjoy all of Prism's rights of ownership in the BuRay Leases.

4. The amount of $1,698,250 is to be paid within **sixty (60) days** by Prism to BuRay to compensate BuRay for the damage caused to the McCoy Well.

5. Prism must pay 40% of its gross revenues from the Prism Leases located in the AMI to BuRay. Should Prism choose not to develop this area within a reasonable time, then the court will deem it as an admission, for purposes of Paragraph 1.7 of the Wells and Leases PSA, that Prism believes the project is not viable. If that is the case, then Prism must assign any leases and acreage in the AMI to BuRay.

6. Prism and Loftis are immediately and permanently enjoined from:

   a. Taking or attempting to take any action or causing or inducing others to take or attempt to take, any action(s) to use, interfere with, profit from, operate, encumber, sell, convey, transfer, assign, lien or otherwise affect the Information – in part or as a whole – or any relating documentation or materials;

b. Taking or attempting to take any action or causing or inducing others to take or attempt to take, any action to use, access, enter upon, interfere with, profit from, operate, encumber, sell, convey, transfer, assign, lien or otherwise affect the Wells, AMI, BuRay Leases, or related assets or BuRay's enjoyment or action concerning any and all rights of ownership – including the right to sell, transfer, encumber, or otherwise dispose of to any party without restriction – in the Wells, AMI, BuRay Leases, or related assets.

7. As a result of Prism's breach of the Wells and Leases PSA and the Operating PSA, Prism is ordered to pay liquidated damages in the amount of $200,000 to BuRay within **sixty (60) days**.

8. Prism and Loftis, jointly and severally, are ordered to pay attorneys' fees in the amount of $11,961 to Greg Granger, $39,758 to Clifford Whitehead, and $96,550 to Mark Miller.   The attorneys have thirty (30) days to submit any additional amounts due with the descriptions for this court to evaluate for reasonableness. Mr. Buthod has thirty (30) days to submit a revised attachment to his affidavit.

The court shall retain jurisdiction over this action for the purpose of enforcing this Order

and to consider any post-judgment relief, if necessary.

**SO ORDERED** this 24th day of  February 2014.

RICHARD L.  YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed electronically to registered counsel of record.